IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MELVIN ESTIWAR JACOME,**<br><br>                              Petitioner,<br><br>         **v.**<br><br>**DIMINGO URIBE, JR.,**<br><br>                              Respondent. | **Case No. 1:13-cv-00072 AWI MJS (HC)**<br><br>**FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent is represented by David Eldridge of the office of the California Attorney General.

I.    **PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Fresno, following his conviction by jury trial on September 9, 2003, for attempted murder with gun

1   enhancements. (Clerk's Tr. at 294-96.) On October 7, 2003, Petitioner was sentenced to

2   a prison term of life plus twenty years. (Id.)

3       On April 27, 2004, Petitioner filed a direct appeal with the California Court of

4   Appeal, Fifth Appellate District. (Lodged Doc. 14.) After full briefing (Lodged Docs. 15-

5   23), on May 20, 2005, the appellate court affirmed the conviction, but struck two gun

6   enhancements, and remanded the matter to the trial court for further adjudication

7   consistent with the order. (Answer, Ex. A.) On June 30, 2005, Petitioner sought a petition

8   of review with the California Supreme Court. (Lodged Doc. 24.) The petition for review

9   was summarily denied by the California Supreme Court on August 31, 2005. (Id.)

10      Upon remand, on May 9, 2006, Petitioner was resentenced by the trial court.

11  (Answer, Ex. B.) Petitioner again appealed on November 27, 2006 to the California Court

12  of Appeal. (Lodged Doc. 29) On June 21, 2007, the court affirmed the judgment, but

13  vacated the sentence imposed, and provided Petitioner thirty days to file a Pitchess

14  motion regarding information in the personnel files of the three police officers of the

15  police officers in question. (Answer, Ex. B.)

16      On October 25, 2007, the trial court granted Petitioner's Pitchess motion.

17  (Answer, Ex. C.) However, on November 1, 2007, upon receipt of the personnel files, the

18  court found the motion without merit. (Id.) Petitioner filed a third appeal with the fifth

19  District Court of Appeal on May 21, 2008. (Lodged Doc. 35.) The appeal was denied on

20  December 30, 2008. (Answer, Ex. C.) Petitioner proceeded to file a petition for review

21  with the California Supreme Court on February 10, 2009. (Lodged Doc. 38.) The petition

22  was denied on April 1, 2009. (Id.)

23      After exhausting his direct review, Petitioner filed a petition for writ of habeas

24  corpus with the California Supreme Court on February 18, 2010. (See Lodged Doc. 39.)

25  The petition was denied on September 15, 2010. (Id.)

26      Petitioner filed the instant federal habeas petition on November 5, 2010. (ECF No.

27  1.) The petition raised five grounds for relief: 1) that there was insufficient evidence to

28  prove that Petitioner acted with premeditation and deliberation; 2) that California

1    evidentiary rules prevented Petitioner from presenting his defense; 3) that the

2    prosecution committed misconduct in asking prejudicial questions regarding Petitioner's

3    drug use; 4) that Petitioner's sentence was improper under <u>United States v. Booker</u>, 543

4    U.S. 220, 230 (2005); <u>Blakely v. Washington</u>, 542 U.S. 296, 301 (2004); and <u>Apprendi v.</u>

5    <u>New Jersey</u>, 530 U.S. 466, 476-477 (2000); 5) that Petitioner's trial counsel was

6    ineffective for failing to consult with a ballistics expert; and 6) that appellate counsel was

7    ineffective.

8           Respondent filed an answer to the petition on March 18, 2013. (Answer, ECF No.

9    13.) Petitioner filed a traverse on July 18, 2013. (Traverse, ECF No. 23.)

10   **II.    STATEMENT OF THE FACTS[1]**

11          Appellant Melvin Estiwar Jacome led three Sanger police officers
     on a high speed chase, which culminated when he opened fire on them
12   with a semi-automatic weapon and they returned fire and wounded him.
     He was convicted of premeditated attempted murder of a police officer
13   and sentenced to life with the possibility of parole plus 20 years for a
     firearm enhancement.
14

15          …

16          At 12:30 a.m. on March 24, 2002, Sanger Police Officer Noel
     Johnson was working the night patrol shift in his community. Johnson was
17   dressed in uniform and was operating a marked City of Sanger police car.
     While Johnson was stopped at a red traffic signal, a citizen pulled up next
18   to his squad car and reported an apparent drunk driver. The citizen saw
     the driver at the nearby intersection of Annadale and Academy Avenues
19   and said the driver was proceeding eastbound on Annadale in a pickup
     truck. Officer Johnson immediately headed eastbound on Annadale in an
20   attempt to locate the vehicle. A few seconds later, the officer saw the
     taillights of the pickup truck ahead of him.

21          Officer Johnson attempted to overtake the pickup truck by
     accelerating the speed of the patrol car. He observed the pickup was
22   swerving from side to side and was repeatedly crossing over into the
     westbound (oncoming) lane of traffic. Johnson activated the siren and light
23   bar of his vehicle and the pickup responded by accelerating, requiring
     Johnson to accelerate to 80 miles per hour to "close the gap." The pickup
24   continued to swerve into the westbound lanes despite the presence of
     oncoming traffic. To avoid creating a collision between the pickup and
25   oncoming traffic, Johnson turned off his siren and emergency signals but
     continued to pursue the pickup truck at speeds from 70 to 80 miles per
26

27   ---
     [1] The Fifth District Court of Appeal's summary of the facts in its December 30, 2008 opinion is presumed
     correct.  28 U.S.C. § 2254(e)(1).

28

3

hour. The pickup finally came to a stop in a rural area outside of the Sanger city limits. Officer Johnson pulled up behind the truck and began to get out of his patrol vehicle. Before Johnson was completely out of his car, the pickup started moving again, made a U-turn using both lanes of traffic and then headed back in the direction of Sanger.

By this time, two other Sanger police officers in marked police vehicles joined the pursuit. Officer Johnson's vehicle was first in pursuit. Sergeant Fred Sanders directed the pursuit from his position behind Johnson. Officer Robert Theile drove in the number three position. After the U-turn, the pickup proceeded westbound on Annadale with the three police vehicles in pursuit. All of the police vehicles had activated sirens and emergency signals. When the pickup reached a three-way intersection at Riverbend Avenue, it came to a skidding stop and locked its brakes for several seconds. The pickup then proceeded northbound on Riverbend into a rural ranching area. The police units followed the pickup at about 45 miles per hour. After traveling a half mile on Riverbend, the pickup turned westbound and traveled onto the Hedrick Ranch. The pickup went 100 to 150 yards on a private road and then stopped near a trailer and gate.

Officer Johnson began to step out of his police unit and made eye contact with the driver, the appellant. He saw that appellant was pointing a black pistol at him. Johnson moved to the rear of his police car and yelled "gun" several times to warn his fellow officers. Appellant almost instantly discharged his weapon. The volley lasted about four seconds and Sergeant Sanders and Officer Theile observed multiple muzzle flashes coming from the driver's side window of the pickup truck. From his vantage point, Theile could see appellant pointing the weapon at Officer Johnson before discharging it. All three officers returned fire with their .40-caliber Glock service pistols. Johnson yelled about 10 times, both in English and in Spanish, and ordered appellant to put his hands up and open his truck door. However, appellant did not comply.

After a 10- to 15-minute wait, Sergeant Sanders approached appellant in the pickup truck and took him into custody. Appellant had sustained a gunshot wound in the ribcage and injury to two fingers of his left hand. Officers examined the interior of the pickup cab and seized a nine-millimeter assault weapon from the seat. The weapon had been struck by a bullet during the exchange of gunfire. They also found cartridge casings, blood and broken glass inside the truck. Officer Johnson noted three holes in the driver's side door of his police car and saw that another round had shattered the passenger side window of that car.

District Attorney Investigator Lee Cotter testified the seized weapon was an Intratec AB-10 nine-millimeter semi-automatic weapon. Cotter said the weapon was self-loading but not self-firing. In other words, the firing of each round required a separate pull of the trigger. Cotter explained the weapon's magazine holds at least 18 nine-millimeter rounds but the magazine had been rendered inoperable by the bullet that struck the weapon. Officer Johnson testified this assault weapon uses a detachable magazine as well as a second handgrip.

Jose Guerrero, an identification technician with the Fresno County Sheriff's Department, said he examined Officer Johnson's police car and

4

found three bullet holes in the driver's side door and recovered three spent bullets inside the vehicle. He determined the bullet holes were made by shots fired from outside the vehicle. Nine expended casings were found at the scene. The casings and the spent projectiles were of nine-millimeter caliber. Michael Giborson, a criminalist with the Fresno County Sheriff's Department Forensics Laboratory, examined the expended projectiles found in Johnson's vehicle and said they had been fired from appellant's assault weapon. Jose Guerrero further testified the trajectory of the bullets was consistent with having come from appellant's position in the pickup truck.

There was also evidence that Officer Johnson's patrol car (No. 251) was equipped with a video camera. A videotape was removed from the video recorder in the trunk. There was no visible damage to the video recorder. It was stipulated that the videotape showed a series of traffic stops, with an end-date of February 25, 2002. The rest of the tape was blank and the videotape did not contain any images from the pursuit, exchange of fire, or apprehension of appellant.

A subpoena was served on the Sanger Police Department as to the status of the video camera in Officer Johnson's car. The department responded that the video camera was inoperable on the date of the incident. The department did not have any documents or records to indicate that Officer Johnson's patrol car was equipped with a video camera, that anyone had reported the video camera was not working or needed repair, or that the video camera was subsequently tested and found inoperable. After this incident, however, a verbal report was made that the video camera was not working and it was replaced.

At trial, Officer Sanders testified that he was aware that the video camera in Officer Johnson's patrol car did not work.

"Q Okay. Do you know if the vehicle that Officer Johnson was driving was equipped with a video camera?
"A It was equipped with a non-functioning video camera.
"Q How do you know it was non-functioning?
"A Because it didn't work.
"Q And how do you know it didn't work? Did you operate that vehicle?
"A No, it was a few days prior to that that I was contacted and said there was a problem with it and we passed that on up to see about having it fixed."

**Defense**

Fresno County Sheriff's Deputy Daniel Epperly testified as a defense witness that he was on patrol when he responded to a dispatch that Sanger police officers were in pursuit of a vehicle. As he headed to the scene, the dispatch requested backup officers for an officer-involved shooting. Epperly did not hear any radio traffic between the Sanger police officers because his radio could not switch to their channel.

Deputy Epperly testified he arrived at the scene and found the patrol cars positioned around the driver's side and rear of the pickup truck. The other officers had their guns drawn and they had taken cover. Epperly got out of his patrol car, drew his weapon and took cover behind one of the Sanger police cars. He asked one of the officers about the situation.

5

The officers communicated without looking at each other, and Epperly was not sure who he was speaking to.

Deputy Epperly moved to a different position to get a better view of the driver's side of the pickup truck. He saw movement through the truck's rear window but it was dark and he could not determine what was going on. Epperly testified that appellant eventually sat up in the driver's seat, opened the door and got out of the pickup truck. Appellant stood up, showed his hands and walked toward the rear of the truck. Appellant was "kind of in a slumping over position, took a few steps and fell onto the ground." Epperly testified that the Sanger officers did not approach the truck prior to appellant getting out, and they did not force him to the ground.

Deputy Epperly testified what happened after appellant fell down.

"One--one Sanger PD officer grabbed his arm, two other Sanger PD officers, one was yelling at him in Spanish and I'm not fluent enough in Spanish to understand exactly what he was saying, there was another officer there that was yelling at him in English to show his hands. He had this--[appellant] had one hand concealed underneath his body. [P] … [P] One Sanger PD officer grabbed one arm, after the other Sanger officers didn't grab the other arm, I did."

Epperly pulled appellant's left arm out from underneath his body, and moved appellant's arm behind his back so he could be placed in handcuffs.

Deputy Epperly testified that he was not involved in the shooting and no shots were fired while he was at the scene. After appellant was taken into custody, Epperly maintained the perimeter and obtained the names of the three Sanger officers so he could write his report. He had not met Officer Thiele before the incident and just spoke with him briefly at the scene. He might have previously met Officer Johnson but he did not know him "very well at all." As for Officer Sanders, Epperly had previously spoken with him "on a number of occasions, brief conversations I've seen him around Sanger. These other two officers, I don't know." Epperly testified he had not spoken to any of the three officers regarding the incident.

On the evening of the shooting, appellant went to the home of a former coworker, Antonio De La Cruz, had three shots of tequila and left between 9:45 and 10:00 p.m. Appellant later arrived at Top's Bar in Sanger and drank five double tequilas over a 90-minute period. Appellant's friend, Ishmael Vargas Menera, met appellant at the bar and saw him drink at least three tall glasses of tequila. Sonia Lopez, a bartender at Top's, testified appellant started to bother people and his friend took him out of the bar. Appellant and Menera left Top's and Menera drove the pickup truck because appellant was drunk. Menera saw appellant's gun on the seat in the pickup truck. The gun was located underneath a jacket. Appellant and Menera went to the El Abril bar and Menera saw appellant drink two more double shots of tequila at that establishment.

At one point, appellant went outside of the El Abril bar for 30

6

minutes and Menera offered to take him home. Appellant declined and explained his wife was going to pick him up. After hearing that explanation, Menera returned the pickup keys to appellant. Appellant then drove away from the El Abril.

Appellant testified on his own behalf. He said he began working at the Hedrick Ranch in 1999 and aspired to become a jockey. However he had trouble getting his weight sufficiently low and began taking two or three Metabolite pills a day over a period of 17 months in order to lose weight. The pills occasionally caused him to hear noises. He took Metabolite on March 23, 2002. Appellant recalled the early part of that evening but could not remember anything after giving Ishmael Menera his pickup keys at Top's Bar. Appellant said he woke up in a hospital, had difficulty breathing and noticed his left hand was bandaged.

Appellant purchased the Intratec weapon in 1999. When he left his house on March 23, 2002, he put the Intratec in his truck because he had been arguing with his wife and because he intended to go hunting. He had one or two drinks of tequila before leaving his house and then drove to Antonio's house, where he consumed three or four more tequila drinks. From Antonio's house, appellant went to Top's Bar.

Appellant's employer, William Hedrick, testified he had hired appellant to break horses on his ranch and had a high opinion of appellant's character for truthfulness. Appellant's common-law wife, Evelin Palma, testified appellant was never violent with her. Palma said appellant began drinking more after the birth of their second child on December 26, 2001. She also said appellant was taking Metabolite three times a day during the two weeks preceding the shooting. Hedrick foreman Andreas Hernandez lived on the ranch and said he did not hear any police car sirens before he heard the gunshots on March 24, 2002.

The parties stipulated that appellant's blood was drawn at 1:54 a.m. on March 24, 2002, and the blood alcohol level was 0.193. They also stipulated that his blood was drawn at 2:50 a.m. that same day and the blood alcohol level was 0.14. No illicit drugs were found in appellant's system. Raymond Deutsch, M.D., a specialist in addiction medicine, testified about the effect of ephedrine and alcohol on the human brain. Dr. Deutsch said Metabolite contains ephedrine and that appellant met the criteria for addiction to alcohol. Dr. Deutsch said a .19 blood alcohol level would reduce a person's inhibitions such that the person could not make deliberate judgments. He also said ephedrine ingestion has been associated with psychosis when taken in fairly high doses and can cause hallucinations.

Appellant was convicted of count I, willful, deliberate and premeditated attempted murder of a peace officer/firefighter (Pen. Code, §§ 187, subd. (a); 664, subds. (e), (f)); count II, use of a machine gun/assault weapon on a peace officer/firefighter (§ 245, subd. (d)(3)); and count III, evading an officer with willful disregard (Veh. Code, § 2800.2, subd. (a)). As to counts I and II, the jury found appellant personally used and intentionally discharged a firearm (§ 12022.53, subd. (c)); personally used a firearm in a statutorily specified offense (§ 12022.53, subd. (b)); and personally used a firearm in the attempted commission of a felony (then § 12022.5, subd. (a)(1)).

7

1   <u>People v. Jacome</u>, 2008 Cal. App. Unpub. LEXIS 10542 (Dec. 30, 2008).

2   **II.**   **DISCUSSION**

3   **A.**   **Jurisdiction**

4   Relief by way of a petition for writ of habeas corpus extends to a person in

5   custody pursuant to the judgment of a state court if the custody is in violation of the

6   Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. §

7   2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he

8   suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the

9   conviction challenged arises out of the Fresno County Superior Court, which is located

10   within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court

11   has jurisdiction over the action.

12   **B.**   **Legal Standard of Review**

13   On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

14   Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

15   filed after its enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 326 (1997); <u>Jeffries v. Wood</u>,

16   114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of

17   the AEDPA; thus, it is governed by its provisions.

18   Under AEDPA, an application for a writ of habeas corpus by a person in custody

19   under a judgment of a state court may be granted only for violations of the Constitution

20   or laws of the United States. 28 U.S.C. § 2254(a); <u>Williams v. Taylor</u>, 529 U.S. at 375 n.

21   7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in

22   state court proceedings if the state court's adjudication of the claim:

23
24   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

25
26   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

27   28 U.S.C. § 2254(d).

28   1.   <u>Contrary to or an Unreasonable Application of Federal Law</u>

1       A state court decision is "contrary to" federal law if it "applies a rule that
2   contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts
3   that are materially indistinguishable from" a Supreme Court case, yet reaches a different
4   result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06.
5   "AEDPA does not require state and federal courts to wait for some nearly identical
6   factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that
7   even a general standard may be applied in an unreasonable manner" Panetti v.
8   Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).   The
9   "clearly established Federal law" requirement "does not demand more than a 'principle'
10  or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state
11  decision to be an unreasonable application of clearly established federal law under §
12  2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle
13  (or principles) to the issue before the state court.  Lockyer v. Andrade, 538 U.S. 63, 70-
14  71 (2003).  A state court decision will involve an "unreasonable application of" federal
15  law only if it is "objectively unreasonable." Id. at 75-76, quoting Williams, 529 U.S. at
16  409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the
17  Court further stresses that "an *unreasonable* application of federal law is different from
18  an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing Williams, 529
19  U.S. at 410) (emphasis in original).   "A state court's determination that a claim lacks
20  merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the
21  correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541
22  U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts
23  have in reading outcomes in case-by-case determinations."  Id.; Renico v. Lett, 130 S.
24  Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established
25  Federal law for a state court to decline to apply a specific legal rule that has not been
26  squarely established by this Court."  Knowles v. Mirzayance, 129 S. Ct. 1411, 1419
27  (2009), quoted by Richter, 131 S. Ct. at 786.

28

1

## 2.    Review of State Decisions

2        "Where there has been one reasoned state judgment rejecting a federal claim,

3   later unexplained orders upholding that judgment or rejecting the claim rest on the same

4   grounds."  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the

5   "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

6   (9th Cir. 2006).  Determining whether a state court's decision resulted from an

7   unreasonable legal or factual conclusion, "does not require that there be an opinion from

8   the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784-85.

9   "Where a state court's decision is unaccompanied by an explanation, the habeas

10  petitioner's burden still must be met by showing there was no reasonable basis for the

11  state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does

12  not require a state court to give reasons before its decision can be deemed to have been

13  'adjudicated on the merits.'").

14        Richter instructs that whether the state court decision is reasoned and explained,

15  or merely a summary denial, the approach to evaluating unreasonableness under §

16  2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

17  or theories supported or, as here, could have supported, the state court's decision; then

18  it must ask whether it is possible fairminded jurists could disagree that those arguments

19  or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

20  Thus, "even a strong case for relief does not mean the state court's contrary conclusion

21  was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves

22  authority to issue the writ in cases where there is no possibility fairminded jurists could

23  disagree that the state court's decision conflicts with this Court's precedents." Id.  To put

24  it yet another way:

25              As a condition for obtaining habeas corpus relief from a federal
            court, a state prisoner must show that the state court's ruling on the claim
26          being presented in federal court was so lacking in justification that there
            was an error well understood and comprehended in existing law beyond
27          any possibility for fairminded disagreement.

28  Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts

1    are the principal forum for asserting constitutional challenges to state convictions." Id. at

2    787. It follows from this consideration that § 2254(d) "complements the exhaustion

3    requirement and the doctrine of procedural bar to ensure that state proceedings are the

4    central process, not just a preliminary step for later federal habeas proceedings." Id.

5    (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

6                    3.    Prejudicial Impact of Constitutional Error

7         The prejudicial impact of any constitutional error is assessed by asking whether

8    the error had "a substantial and injurious effect or influence in determining the jury's

9    verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

10   U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

11   state court recognized the error and reviewed it for harmlessness). Some constitutional

12   errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v.

13   Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659

14   (1984). Furthermore, where a habeas petition governed by AEDPA alleges ineffective

15   assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the

16   Strickland prejudice standard is applied and courts do not engage in a separate analysis

17   applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002). Musalin

18   v. Lamarque, 555 F.3d at 834.

19   **III.    REVIEW OF PETITION**

20        **A.    Claim One: Insufficient Evidence**

21        Petitioner claims that his due process rights were violated because there was

22   insufficient evidence to support finding premeditation and deliberation with regard to the

23   attempted murder. (Pet.)

24                    1.    State Court Decision

25        Petitioner presented this claim by way of direct appeal to the California Court of

26   Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

27   appellate court and summarily denied in subsequent petition for review by the California

28   Supreme Court. (See Answer, Ex. A., Lodged Doc. 24.) Because the California Supreme

Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the California Court of Appeal explained:

**SUFFICIENCY OF EVIDENCE: PREMEDITATION AND DELIBERATION**

Appellant contends there was insufficient evidence as a matter of law to prove that he premeditated and deliberated the offense charged in count I. He generally contends "the simple fact here is that there is no substantial evidence on this record to prove premeditation and deliberation."

He more specifically argues:

"It takes little effort to see that the prosecution in appellant's case introduced no evidence of either planning activity or manner of attempted killing that would support a finding of premeditation. Appellant had no prior relationship with Johnson and engaged in no behavior earlier that evening showing he planned to kill anyone. No evidence explained why he had the gun in his truck, but he most certainly put it there long before he figured out that the police wanted to detain or arrest him for drunk driving. Similarly, there is nothing about suddenly pointing a gun at a police officer after an otherwise fairly innocuous chase that demonstrates premeditation. Indeed, Officer Johnson apparently believed he was not in any particular danger by the end of the chase, since he didn't even draw his own firearm until after he saw appellant's gun pointed at him.

"Evidence of motive is similarly lacking. Although respondent may argue that appellant's motive was to avoid arrest, no evidence showed appellant would have any more reason than other drunk drivers to avoid arrest, such as knowing he was a three-strike candidate who might be facing a life

sentence if he were arrested. Further, even the motive of evading arrest does not require the sort of reflection necessary to prove premeditation. It may be entirely spontaneous. Equally spontaneous is the use of a gun that was in appellant's truck long before he had any idea he would have a confrontation with police. And shooting, of course, is a type of attack that is particularly - albeit unfortunately - spontaneous, needing virtually no planning at all if the weapon is close at hand.

"The absence of any evidence of planning, motive, or manner of shooting that would clearly indicate premeditation, combined with undisputed evidence that appellant's mental faculties were impaired by alcohol at the time of the shooting, leaves the record devoid of sufficient evidence to support a finding of premeditation."

In count I of the information, the district attorney charged appellant with attempted murder of a peace officer/firefighter ( §§ 187, 664) with the further allegation, for purposes of sentencing, that the offense was willful, deliberate, and premeditated ( § 664, subds. (e), (f)). "Premeditated" means considered beforehand. "Deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. (People v. Vorise (1999) 72 Cal.App.4th 312, 318.)

Murder is the unlawful killing of a human being, or a fetus, with malice aforethought. (§ 187, subd. (a).) An "attempt" is a direct, but ineffectual act toward commission of a crime. (People v. Hill (1997) 58 Cal.App.4th 1078, 1089.) The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice - a conscious disregard for life - suffices. Thus, to constitute murder, the guilty person need not intend to take life. However, to constitute an attempt to murder, he or she must so intend. In other words, the wrongdoer must specifically contemplate taking life. (People v. Bland (2002) 28 Cal.4th 313, 327-328.) In sum, attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. (People v. Lee (2003) 31 Cal.4th 613, 623.)

In California, there are three types of evidence generally relied upon to support a finding of premeditation and deliberation: """(1) facts about how and what [the] defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing-- what may be characterized as "planning" activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse

hastily executed" [citation]; (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).'" [Citations.]' [Citation.]" (<u>People v. Martinez</u> (2003) 113 Cal.App.4th 400, 412.) Although evidence concerning motive, planning, and the manner of killing are pertinent to the determination of premeditation and deliberation, these factors are not exclusive nor are they invariably determinative. (<u>People v. Silva</u> (2001) 25 Cal.4th 345, 368; <u>People v. Bolin</u> (1998) 18 Cal.4th 297, 331.)

Reviewing courts do not distinguish between attempted murder and completed first degree murder for purposes of determining whether there is sufficient evidence of premeditation and deliberation. (<u>People v. Herrera</u> (1999) 70 Cal.App.4th 1456, 1462, fn. 8.) To determine the sufficiency of the evidence to support a conviction, or finding an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. We apply this standard in determining the sufficiency of the evidence to establish premeditation and deliberation as elements of first-degree murder. (<u>People v. Silva</u>, supra, 25 Cal.4th at p. 368.) The same is true as to appellate review of the willful premeditated and deliberate finding pertaining to attempted murder. A reviewing court may not substitute its judgment for that of the jury and must view the record favorably to the judgment below to determine whether there is evidence to support the judgment. The function of the appellate court is not to scour the record in search of evidence suggesting a contrary view. (<u>People v. Ceja</u> (1993) 4 Cal.4th 1134, 1143.)

On the afternoon of September 2, 2003, at the close of the prosecution's case-in-chief, appellant moved to dismiss the charges for lack of evidence ( § 1118). The court denied the motion, stating as to count I:

"The evidence, as received, supports each of the charges and enhancements, and the reason is this: As far as an intent to kill, an intent to kill may be inferred from the circumstances. There is evidence in the record that Officer Johnson after stopping the Defendant's vehicle, made eye contact with him. The two of them met eyes, that the Defendant looked directly at him and at that point then pointed the weapon out of the vehicle and shot three times in his direction. Little evidence is substantial that those three shots were directed at him, um, the location where they hit the vehicle almost directly in line with him, and so that is evidence which supports an inference of a specific intent to kill him. As far as the allegations of premeditation there is a theory, that is supported by the Defendant's having led the officers out into the country, then back to the location where he led them, that at some point during this chase,

14

since so promptly after the chase concluded he pulled this weapon out, stuck it out the window, and fired. There is at least evidence from which the jury could infer that he formed the intent to get these officers into a remote location and execute them, and that is supported by his having gone out into the country then coming back to a location familiar to him, stopping, pulling the gun out, and then after making eye contact with the officer, firing in his direction. There was an opportunity for him to reflect.

"And again, notwithstanding what's promised in the defense case, that he was too inibriated [sic] to form those opinions or form that intent all those other things that we hear about, those are not on the case before me. Those are not presently evidence in this case, and they're nothing but promises. On the evidence before me, he locked eyes with the officer and he attempted to kill him, and there was an opportunity for him to reflect and premeditate that intent, or that attempt, and that was his opportunity as he led these officers finally down this remote road out into the country. As far as the enhancements go, they're general intent enhancements, and, certainly, well supported by the evidence that he personally used the weapon, that he intentionally discharged the weapon, and that the weapon was an assault weapon as charged. While the evidence supports a conclusion that it was not an intertech tech 9, it's a matter of notice to the Defendant, that he's charged with personally using an assault weapon and that notice is provided by the allegation. It's an intertech AB10, but, nonetheless, that is supported by the evidence that he used that assault weapon. The evidence is strong that it's an assault weapon, that's clear from the evidence and from the weapon itself. So as to Count 1, as is to the allegation of premeditation as to the enhancements all of [sic] well supported by the evidence before me."

Here, as the trial court noted, the jury could reasonable infer that appellant used a circuitous route of travel to lure the officers into a remote location and to execute them. In other words, the jury could determine that appellant engaged in planning activity by leading the officers into an isolated area and then confront them with a loaded firearm. With respect to the manner of the attempt, the jury could determine that appellant almost immediately drew his weapon after stopping the truck, made eye contact with Officer Johnson, and then fired his assault weapon at least nine times, requiring nine separate pulls of the trigger. At least three of those shots penetrated the door of Johnson's police vehicle. From this course of events, the jury could conclude that appellant acted deliberately and with premeditation and was therefore guilty of attempted murder of a peace officer and that the offense was willful, deliberate and premeditated.

1
2

The jury's determination of premeditation and deliberation was well within the jury's province as factfinder and reversal for insufficiency of evidence is not required.

People v. Jacome, 2005 Cal. App. Unpub. LEXIS 4472 (Cal. App. May 20, 2005).

3
4

### 2.   Legal Standard - Sufficiency of the Evidence

5
6
7
8
9
10
11

The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may be convicted only by proof beyond a reasonable doubt of every fact necessary to constitute the charged crime. Jackson v. Virginia, 443 U.S. 307, 315-16, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Under the Jackson standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (emphasis in original).

12
13
14
15
16
17

In applying the Jackson standard, the federal court must refer to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16. A federal court sitting in habeas review is "bound to accept a state court's interpretation of state law, except in the highly unusual case in which the interpretation is clearly untenable and amounts to a subterfuge to avoid federal review of a constitutional violation." Butler v. Curry, 528 F.3d 624, 642 (9th Cir. 2008) (quotation omitted).

### 3.   Analysis

18
19
20
21
22
23
24
25
26

Petitioner asserts that there was insufficient evidence to find that Petitioner committed the attempted murder with premeditation and deliberation. Petitioner argues in his petition that the shooting was not premeditated, but rather spontaneous, because he did not have a prior relationship with the police officer and there was no evidence as to why or for how long the gun had been in Petitioner's vehicle. Petitioner further argued that, with regard to motive, he would have no more interest in evading arrest than any other driver that violated the law. Finally, with regard to premeditation, Petitioner argues that due to his mental impairment from alcohol at the time of the offense, there was insufficient evidence of any planning or motive.

27
28

The state court found that based on the evidence presented, the jury could infer from Petitioner's actions that he intended to lead the officers out to a remote area to

1 execute them. The evidence supported the fact that Petitioner drove to a secluded area,

2 while armed, and upon stopping made eye contact with the approaching officer, and

3 then pulled his weapon and began firing.

4     The Court of Appeal considered Petitioner's challenge to the sufficiency of the

5 evidence for premeditation and deliberation on direct appeal. The court explained that

6 the jury could reasonably infer that appellant used a circuitous route of travel to lure the

7 officers into a remote location and to execute them. Based on the events and the

8 reasonable inferences created, the court concluded that there was sufficient evidence for

9 the jury to conclude that Petitioner acted deliberately and with premeditation and was

10 guilty of a willful, deliberate and premeditated attempted murder.

11     With regard to this petition, Petitioner argues that the court of appeal decision was

12 unreasonable because it only reviewed the prosecution's evidence in reviewing the

13 claim, but failed to look at the evidence presented by Petitioner. Even if true, Petitioner

14 provides no reasoning as to how the state court's result would have been different had it

15 reviewed the evidence presented by Petitioner. Furthermore, under Jackson and

16 AEDPA, the state decision is entitled to double deference on habeas review. Based on

17 the Court's independent review of the trial record, it is apparent that Petitioner's

18 challenge to whether the crime was committed with deliberation and premeditation is

19 without merit. There was no constitutional error, and Petitioner is not entitled to relief with

20 regard to this claim.

21     **B.      Claim Two: Expert Witness Claim**

22     In his second claim, Petitioner asserts that the trial court inappropriately limited

23 the testimony of his expert witness, Raymond Deutsch, M.D.

24          1.     State Court Decision

25     Petitioner presented this claim by way of direct appeal to the California Court of

26 Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

27 appellate court and summarily denied in subsequent petition for review by the California

28 Supreme Court. (See Answer, Ex. A., Lodged Doc. 24.) Accordingly , using the look-

1   through doctrine, the Court shall review the California Court of Appeal decision, the last

2   reasoned state court decision. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3

3   (1991). In denying Petitioner's claim, the California Court of Appeal explained:

4   **LIMITATION OF EXPERT TESTIMONY**

5   Appellant contends the trial court improperly limited the testimony
    of his expert witness, Raymond Deutsch, M.D.

6

7   On September 3, 2003, the prosecution examined Dr. Deutsch
    outside the presence of the jury because of concerns the prosecution had
    not received any discovery as to this defense expert witness. The
8   following exchange occurred during that examination:

9   "Q [By the Court] And just, sir, what are you going to testify to?

10  "A [By Mr. Deutsch] I'm going to testify to the effects of alcohol and
    possible ephedrine on the emotional and psychological status of people in
11  general. I was going to testify as to the … Court, the parts of the brain that
    are affected, and various relationships and the thinking process. I was
12  going to testify as to whether or not it was possible for a person to act
    without significant deliberation in an emergency situation, which we call a
13  flight or fight reaction, and then we were going to proceed into a
    hypothetical regarding the situation in question at this time.
14
    "Q Now, I take it you've covered all these things with Mr.
15  Harralson?

16  "A Very briefly.

17  "Q When was that?

18  "A Basically over the last 24 hours.

19  "Q Now, sir, you apparently have qualified as an expert before?

20  "A Yes, I have.

21  "Q And you've testified in homicide and attempted homicide cases?

22  "A Yes, I have.

23  "Q So I take it you then cannot testify as to the ultimate issue in this
    case?
24
    "A I'm aware of that, yes.
25
    "Q And just how do you propose to get around that, because that's
26  --

27  "MR. HARRALSON [defense counsel]: Objection, Your Honor.
    That's not the scope of--
28

18

1    "THE COURT: He just said he'd be asked a hypothetical. It sounds like, assume these facts, could that person have had the intent.

2    "MR. HARRELL [deputy district attorney]: Your Honor, that was what was presented in opening statement, I believe--

3    "THE COURT: Absolutely.

4    "MR. HARRELL: -- as to what he was gonna testify to. That is contrary to law. I have the authorities here. I want to be certain that is not going to be presented out of the mouth of this gentleman during the course of this testimony.

5

6

7    "THE COURT: I don't think there's any dispute in the law on that. I can instruct his Counsel he can't ask for that opinion. You got any authority that tells me you can?

8

9    "MR. HARRALSON: No, Your Honor.

10    "THE COURT: So you're gonna give him a hypothetical, assume he's had ten shots of tequilla, led these cops on the chase, could he have intended to kill the cops? Is that what you were gonna ask him?

11

12    "MR. HARRALSON: No, that wasn't.

13    "THE COURT: Okay. Cause you're not gonna ask him that. If you do, I'll light up in front of this jury. [P] So what hypothetical did you have in mind responding to, Doctor?

14

15    "THE WITNESS: I was gonna leave that up to the attorney to determine the exact form of the hypothetical. I'm not a lawyer."

16

17    The court ultimately ruled:

18    "… I'm just gonna instruct you, sir, if you're asked a question about whether this Defendant could have had the intent to kill these officers, or whether he could have under some set of circumstances known they were officers, acting in the performance of their duties, those ultimate issues that are at issue in this case, I'm instructing you not to answer. [P] And, Mr. Harralson, you're not to ask him those questions. I don't know what hypotheticals you plan to ask him or what you plan to elicit from this expert who has prepared no report . . .."

19

20

21

22    During the defense case at trial, Dr. Deutsch described the "fight-or-flight" reaction to the jury:

23

24    "Fight-or-flight reaction's a well-studied phenomenon…. It's well known to most people, and it involves primitive survival instinct whereby an animal - and that includes any animal higher than a reptile, basically, cause you have to have some type of a forebrain in order to have some of these behaviors, but most mammals have a fight-or-flight response, which is an in-built neurological circuit whereby the organism can make a reaction when under stress, and so if faced with a stressful situation or a dangerous situation, it will either fight, if it's a fighter, if it's the aggressor, or it will flee the situation if it's a potential victim."

25

26

27

28

Dr. Deutsch said the use of alcohol and Metabolite along with stress would lower the threshold for a fight-or-flight reaction in a human.

Dr. Deutsch also explained to the jury the automatic nature of the "flight-or-fight" reaction:

"The fight-or-flight reaction is an automatic reaction. It's physiological and involves what we call -- there's two portions of the nervous system, basically, one is -- has to do with autonomic and one has to do with motor functions. These autonomics have to do with -- are further broken down into two parts, which is -- one is vegitative digestive functions, and one is reactive functions, mediated by things like adrenalin. And the reactions of the amygdala are to initiate the adrenalin-type behaviors which are stimulatory focusing behavior, increased heart rate, pulse, hair standing on end, so these are automatic … behaviors that do not involve any thinking. You can't decide, well, I don't want my hair to stand on end or I don't want my heart rate to increase, that's what we call an automatic. [P]…[P]

"… Fight or flight has a spectrum where it can be triggered. Once triggered, these reactions tend to go all or none. In other words, once you are in a startled response, you tend to jump to get out of the way of a car or whatever thing has startled you, and you react all the way. You jump out of the road for instance, so once triggered these fight or flight reactions tend to go to completion. In the flight reactions of animals they -- let's say the Zebra sees a lion, its heart rate increases, its pupils dilate, its attention is focused on the lion, then, when it starts to run, it will run. It wouldn't matter if the lion wasn't chasing it anymore. It will run until that flight reaction has reached its termination."

Later during defense counsel's direct examination of Dr. Deutsch, the following exchange occurred before the jury:

"Q [By defense counsel Harralson] Okay. Are there any psychiatric side effects to the use of ephedrine contained in, like, the metabolite and those types of over-the-counter drugs, if you know?

"A [By Dr. Deutsch] Yes, I had a chance to review the literature on ephedra over the last couple of days, and certainly there are documented reports beginning back in the 1960s of psychiatric side effects, including paranoia, delusions, and psychosis as well as behavioral abnormalities such as liability of mood being up and down, erratic, so those are well reported with higher doses of ephedrine.

"Q Now, in this case you learned from the police reports that Mr. Jacome was driving a vehicle at or near the time of this incident, correct?

"A Correct.

"Q And did you also learn that his driving was at least reported by the officers to be impaired?

"A I did note that, yes.

"Q And did you note that Mr. Jacome ultimately arrived at his residence?

1    "A Yes.

2    "Q Okay. Does that comport with the fight or flight mechanism that
3    you -- that you discussed previously?

4    "MR. HARRELL: Objection, Your Honor, based on this Court's
     ruling.

5    "THE COURT: Does it comport?

6    "MR. HARRELL: Also vague as to fight or flight. Which portion are
7    we talking about? The Doctor testified about different aspects of it.

8    "THE COURT: I think its vague. You can rephrase.

9    "MR. HARRALSON: Okay.

10   "Q Does the behavior as described in the police reports attributed
     to Mr. Jacome fit the fight-or-flight reaction model?

11   "MR. HARRELL: Same objection, Your Honor.

12   "THE COURT: Um, let me see Counsel. [P]…[P] Back on the
13   record. Sustained.

14   "MR. HARRALSON: Q Doctor, can you tell us how alcohol might
     affect a person's ability to deliberate certain decisions?

15   "MR. HARRELL: Objection. Relevance.

16   "THE COURT: No. Overruled.

17   "THE WITNESS: Well, alcohol certainly is notorious for causing
18   impaired judgment. This is a clinical function, one of the most delicate
     critical functions, most highly developed in a species called a human,
19   where the ability to make a predictive behavior is very very finely turned.
     Alcohol at its lowest level appears to impair judgment, which is one of the
20   reasons why it's illegal to drive under the influence of alcohol. You make
     poor decisions, and by 'decisions,' I mean that your ability to make
21   appropriate predictions of what you're gonna do and to act appropriately is
     impaired. You do things under alcohol you would not ordinarily have done,
22   and that is a function of judgment. If you get up on the table at the office
     party and dance, you know, it may be considered inappropriate behavior
23   and you might ordinarily dance on tables in a sober state, but people have
     been known to do that under the influence of alcohol. So those are
24   impairments in function of judgment.

25   "Q Okay. At some point does the consumption of alcohol prevent
     the making of decisions?

26   "A Oh, yes. At some point alcohol will prevent breathing, because
27   there are toxic doses that it can cause death, and when you're dead you
     don't do much thinking.

28   "Q Very good.

21

"A But … since the cortex is one of the earliest involved, there are points which … you will not be thinking under the influence of alcohol. Most of the time this is compatible with being passed out, you know, you're not dead, but you're not thinking."

On cross-examination by the prosecution, Dr. Deutsch testified he did not know whether appellant was engaged in any "fight or flight" or any other type of reaction. Rather "he could only say whether situations are compatible with it. We can't say for sure if that was his [appellant's] situation." On re-direct examination of Dr. Deutsch by defense counsel, the following exchange occurred:

"MR. HARRALSON: Q Do you recall Mr. Harrell's question about whether or not Mr. Jacome's reaction was somehow related to the flight-or-fight syndrome?

"A I do.

"Q And what did you understand in that regard?

"A Well, I understood that he was talking about reactions which began with driving, and eventuated in the shooting, but he didn't state which of those types of behaviors he was referring to, so it was unclear, actually, as to what part he meant was compatible or incompatible with the reaction.

"Q Okay. Was driving a vehicle home … as we understand Mr. Jacome does here, compatible with the fight-or-flight reaction?

"A I would say no. I think there was clear evidence of deliberate thinking behavior, during the driving portion of the sequence of events we're talking about.

"Q But certainly under cross-examination you said that driving home doesn't require a lot of thought, correct?

"A As opposed to driving to a location that you're not familiar with. I said in--in the general--when a person is going home from work, they may not expend a lot of energy or may not need a lot of thinking function to accomplish that. If I were to be asked in this specific instance I would say--

"MR. HARRELL: Objection. Nonresponsive. I think it's also objectionable in light of the Court's ruling.

"THE COURT: Well, I think the answer through 'thinking function to accomplish that' is responsive, that remains in the record. Sustained as to the balance.

"MR. HARRALSON: Q Doctor, does a lack of eating or starvation affect a person along with alcohol and perhaps the use of ephedrine, the Metabolite would that invoke an earlier response in a fight-or-flight response or reaction?

"A It would lower the threshold. The fact people who don't eat and drink alcohol are subjected to a number of medical complications such as

22

hypoglycemia, which may alter conscious behaviors and lead to confusion and unpredictable behavior, but just the stress of the body, undergoing a fact, with all the biochemical changes that happen, added to alcohol, added to ephedrine, um, lowers the threshold. Each of those incrementally is going to lower the threshold for this type of fight-or-flight reaction.

"Q And out of the stress?

"A Stress.

"Q Stress would also be a component?

"A Stress would be a component also, yes."

At the conclusion of Dr. Deutsch's testimony, the court stated outside the presence of the jury:

"… We did have a couple of sidebars. The sidebars were generally related to this question of what does or doesn't violate the case authorities on the subject of expressing an ultimate opinion in the case here regarding the Defendant's intent. Um, essentially those questions--even though they weren't directly eliciting that opinion … where they were based on hypothetical, based on circumstances in the case, and were asked for the purpose of eliciting an opinion regarding the Defendant's thought processes … nonetheless were deemed by the Court to violate that general principle, and that's why the Doctor gave his opinion in the form of assessing, in general, the affect of alcohol, loss of memory … fight or flight, and the other subject areas."

Appellant contends on appeal:

"No case has addressed the precise question presented here - whether an expert may describe a mental process that is inconsistent with forming the intent to kill or with premeditation and then offer the opinion that the defendant's behavior was consistent with that mental process. The plain language of both Penal Code section 28 and 29 … makes clear that such testimony is in fact admissible. Had Dr. Deutsch been permitted to testify that appellant's behavior was consistent with a 'fight-or-flight' reaction, he would not have been testifying that appellant lacked the capacity to premeditate or form the intent to kill. Neither would Dr. Deutsch have been testifying that appellant did not actually form the intent to kill. Rather, his testimony would have given jurors scientific guidelines they could use to infer appellant's lack of intent from his behavior."

Section 28 states in relevant part:

"(a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged. [P]…[P]

"(d) Nothing in this section shall limit a court's discretion, pursuant to the Evidence Code, to exclude psychiatric or psychological evidence on whether the accused had a mental disease, mental defect, or mental disorder at the time of the alleged offense."

Section 29 states:

"In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

Expert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at the guilt phase of a criminal trial. Sections 28 and 29 permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state. Sections 28 and 29 do not preclude offering as a defense the absence of a mental state that is an element of a charged offense or presenting evidence in support of that defense. They preclude only expert opinion that the element was not present. (People v. Coddington (2000) 23 Cal.4th 529, 582-583, overruled on another point by Price v. Superior Court (2001) 25 Cal.4th 1046, 1069, fn. 13.)

In People v. Nunn (1996) 50 Cal.App.4th 1357, the defendant was convicted of four counts of attempted murder, nine counts of assault with a deadly weapon, 13 firearm use allegations ( § 12022.5, subd. (a)), and two great bodily injury allegations ( § 12022.7) arising from his shooting at a group of farmworkers. A clinical psychologist evaluated the defendant and determined he had suffered trauma while serving in Vietnam and had a substance abuse problem. The trial court precluded the psychologist from testifying that defendant impulsively fired his weapon. He appealed and Division One of the Court of Appeal, Fourth Appellant District affirmed, concluding:

"… Thus, in the present case it was permissible for Dr. Lipson [the psychologist] to opine that appellant, because of his history of psychological trauma, tended to overreact to stress and apprehension. It was permissible for him to testify such condition could result in appellant acting impulsively under certain particular circumstances. Dr. Lipson could have evaluated the psychological setting of appellant's claimed encounter with the men at the fence and could have offered an opinion concerning whether that encounter was the type that could result in an impulsive reaction from one with appellant's mental condition. What the doctor could not do, and what the defense proposed he do here, was to conclude that appellant had acted impulsively, that is, without the intent to kill, that is, without express malice aforethought. The court acted properly in excluding Dr. Lipson's opinion that appellant fired his weapon impulsively." (People v. Nunn, supra, 50 Cal.App.4th at p. 1365, fn. omitted.)

24

1
2
3
4
5
6
7
8
9
10
11

      In the instant case, defense counsel similarly sought to elicit testimony from Dr. Deutsch on the ultimate question of appellant's specific state of mind at the time he committed the charged offenses. The trial court properly allowed defense counsel to question Dr. Deutsch about the compatibility of appellant's reactive behavior with fight-of-flight conduct. At the same time, the trial court properly precluded Dr. Deutsch from offering expert opinion testimony that a statutory mental state was or was not present in appellant's case. The record reflects, in fact, that defense counsel agreed with this assessment. In the morning on the day following Dr. Deutsch's testimony, defense counsel requested leave to recall Dr. Deutsch to the stand. After a lengthy discussion between court and counsel, the trial court offered to allow counsel to bring Dr. Deutsch back if counsel could "articulate the particular question that I prohibited you from asking, that would be permitted under the case law." Counsel eventually responded, "Do you believe that Melvin was in fight or flight? I don't think I could have asked that. I could have asked is this the type of situation that might invoke the fight-or-flight reaction, and what elements are present in this situation that you believe might support your--your opinion that fight or flight may be one of the reactions that occurred here. That was where I was going with it." The trial court then said, "Well, I think you got there," and counsel responded "well, okay. If I can argue that, I'm okay." Reversal for evidentiary error is not required.

12  People v. Jacome, 2005 Cal. App. Unpub. LEXIS 4472, 22-38 (May 20, 2005).

13        2.    Analysis

14        Criminal defendants have a constitutional right, implicit in the Sixth Amendment,

15  to present a defense; this right is "a fundamental element of due process of law."

16  Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). See

17  also Crane v. Kentucky, 476 U.S. 683, 687, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636

18  (1986); California v. Trombetta, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413

19  (1984); Webb v. Texas, 409 U.S. 95, 98, 93 S. Ct. 351, 34 L. Ed. 2d 330 (1972); Moses

20  v. Payne, 555 F.3d 742, 757 (9th Cir. 2009). "Necessary to the realization of this right is

21  the ability to present evidence, including the testimony of witnesses." Jackson v.

22  Nevada, 688 F.3d 1091, 1096 (9th Cir. 2012). However, the constitutional right to

23  present a defense is not absolute. Alcala v. Woodford, 334 F.3d 862, 877 (9th Cir.

24  2003). "[A] defendant does not have an absolute right to present evidence, no matter

25  how minimal its significance or doubtful its source." Jackson, 688 F.3d at 1096. "Even

26  relevant and reliable evidence can be excluded when the state interest is strong." Perry

27  v. Rushen, 713 F.2d 1447, 1450 (9th Cir. 1983).

28        A state law justification for exclusion of evidence does not abridge a criminal

defendant's right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused." United States v. Scheffer, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998); see also Crane, 476 U.S. at 689-91 (discussion of the tension between the discretion of state courts to exclude evidence at trial and the federal constitutional right to "present a complete defense"); Greene v. Lambert, 288 F.3d 1081, 1090 (9th Cir. 2002). Further, a criminal defendant "does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Montana v. Egelhoff, 518 U.S. 37, 42, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996) (quoting Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988)). "A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005).

Further, Confrontation Clause violations are subject to harmless error analysis. Whelchel v. Washington, 232 F.3d 1197, 1205-06 (9th Cir. 2000). "In the context of habeas petitions, the standard of review is whether a given error 'had substantial and injurious effect or influence in determining the jury's verdict.'" Christian v. Rhode, 41 F.3d 461, 468 (9th Cir. 1994) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)). Factors to be considered when assessing the harmlessness of a Confrontation Clause violation include the importance of the testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony, the extent of cross-examination permitted, and the overall strength of the prosecution's case. Van Arsdall, 475 U.S. at 684; United States v. Norwood, 603 F.3d 1063, 1068-69 (9th Cir. 2010).

In this case, the trial court limited Petitioner's expert, Dr. Deutsch, from providing testimony on the ultimate question of Petitioner's specific state of mind at the time he committed the charged offenses. The state law restriction on evidence is no different than the restriction imposed by federal law. Federal Rule of Evidence section 704(b) precludes an expert from "stat[ing] an opinion or inference to whether the defendant did

1   or did not have the mental state or condition constituting the element of the crime

2   charged or a defense thereto." The Supreme Court has never struck down this rule

3   because it allegedly prevents a defendant from presenting a defense. Case law indicates

4   that the federal rule, substantively similar to the state rule, is routinely upheld. See

5   United States v. Hofus, 598 F.3d 1171, 1179-80 (9th Cir. 2010).

6        The trial court did not improperly limit Dr. Deutsch's response to defense

7   counsel's question of whether "the behavior as described in the police reports attributed

8   to Mr. Jacome fit the fight-or-flight reaction model?" The trial court prohibited the

9   response to the question based on the testimony falling within the parameters of

10   California Penal Code section 29. To ask whether the behavior of a hypothetical person

11   in Petitioner's circumstances was attributable to the fight-or-flight reaction model could

12   have elicited a response regarding whether Petitioner had the requite intent to commit

13   attempted murder. California Penal Code Section 29 "does not simply forbid the use of

14   certain words, it prohibits an expert from offering an opinion on the ultimate issue of

15   whether the defendant had or did not have a particular mental state at the time he

16   acted." People v. Nunn, 50 Cal. App. 4th 1357, 1364, 58 Cal. Rptr. 2d 294 (1996). Thus,

17   the trial court limited Dr. Deutsch's testimony in a manner that was consistent with

18   section 29. Expert testimony that compels the jury to conclude the defendant did or did

19   not possess the requisite mens rea "encroaches on the jury's vital and exclusive function

20   to make credibility determinations." United States v. Finley, 301 F.3d 1000, 1014-15 (9th

21   Cir. 2002).

22        Moreover, as set forth above, the exclusion of expert testimony pursuant to a

23   state evidentiary rule can be unconstitutional only if the exclusion "significantly

24   undermined fundamental elements of the defendant's defense." Scheffer, 523 U.S. at

25   315. Here, the exclusion of the proffered expert witness testimony did not "significantly

26   undermine" Petitioner's defense because he was allowed to present his defense in all

27   other respects, including evidence regarding his mental state and the flight-or-fight

28   reaction model.

1    The Court finds that fairminded jurists could disagree that the trial court's

2    limitation on the expert witnesses testimony was inconsistent with Supreme Court law.

3    The exclusion of the proffered expert witness testimony did not "significantly

4    undermined" Petitioner's defense, see Scheffer, 523 U.S. at 315, and does not amount

5    to the "unusually compelling circumstances" sufficient to outweigh the strong state

6    interest in administration of its trials. Moses, 555 F.3d at 757. Further, the exclusion of

7    the testimony regarding the ultimate conclusion of the defense expert's testimony was

8    harmless. As the jury was provided testimony regarding Petitioner's potential impairment

9    and the possible implications of the impairment on his ability to form the requisite intent,

10   the limitation on discussing the ultimate question would not have a substantial and

11   injurious effect or influence in determining the jury's verdict. Accordingly, pursuant to 28

12   U.S.C. section 2254(d), Petitioner is not entitled to habeas relief on this claim.

13   **C.    Claim Three: Prosecutorial Misconduct**

14   In his third claim, Petitioner asserts that the prosecutor committed misconduct in

15   presenting an inappropriate question to one of Petitioner's witnesses.

16   1.    State Court Decision

17   Petitioner presented this claim by way of direct appeal to the California Court of

18   Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

19   appellate court and summarily denied in subsequent petition for review by the California

20   Supreme Court. (See Answer, Ex. A., Lodged Doc. 24.) Accordingly, using the look-

21   through doctrine, the Court shall review the California Court of Appeal decision, the last

22   reasoned state court decision. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3

23   (1991) In denying Petitioner's claim, the California Court of Appeal explained:

24   **MOTION FOR MISTRIAL**

25       Appellant contends the trial court erroneously denied his motion for
     mistrial based upon the prosecution's mention of appellant's prior drug
26   use, contrary to the courts' in limine limitation thereof. Appellant couches
     his argument in terms of improper impeachment and prosecutorial
27   misconduct.

28       On July 14, 2004, this court granted appellant's motion to file a

supplemental brief addressing the trial court's denial of a motion for mistrial "made and denied after the prosecutor improperly asked one of the defense witnesses about appellant's prior drug use."

At an August 25, 2003 hearing on motions in limine, the trial court ruled in response to a defense request and upon conclusion of a lengthy exchange between court and counsel:

"So again I'm going to have to hear the evidence before I can give you a final ruling on what or isn't coming in about his past. I think witnesses need to be very specific and if they say, you know I've known the guy from 8:00 to 5:00 Monday through Friday for six months and I've never seen him drunk on the job and I've never seen him abusive to anybody and he's never been violent at work, thank you, Mrs. Jones, nothing else, then they haven't opened the door. But if it's, you know, I've known Mel for seven years and he's not the kind of guy who could do this kind of thing, well how well do you know Melvin? I think there's room for fair inquiry there as far as what they do know about him and how valuable their opinion is about his character. They need a foundation for it and if the foundation is I know him and I know him well, then I think how well they know him is very much at issue. So again I'll have to hear the evidence before I can make any final decisions on that. I'll just say that until we get to this point of some character testimony, then there won't be any mention of his drug use."

The following exchange occurred during the prosecution's cross-examination of appellant's employer, William Hedrick, during the defense case:

"Q [By Mr. Harrell] Good afternoon, Mr. Hedrick. How are you?

"A Hi.

"Q Sir, you said that knowing that Mr. Jacome owned a gun would not change your opinion of him?

"A No, it would not.

"Q What about knowing that he used cocaine and methamphetamine while in your employ?

"A Yes.

"Q Would that change your opinion?

"MR. HARRALSON: Your Honor, objection. May we have a sidebar?

"THE COURT: Yeah.

"(Thereupon, a sidebar conference was held.)

"MR. HARRELL: Q So you said knowing what you know about the case wouldn't change your opinion?

"A One more time?

"Q You said that what you knew about the case would not change your opinion about Mr. Jacome?

"A Well, just--it was out of character for him…."

At the conclusion of Hedrick's testimony, the following exchange between the court and defense counsel occurred outside the presence of the jury:

"MR. HARRALSON: …At this time I'd like to make a motion for mistrial. I made a specific motion in limine against any mention of the fact that my client had ever used methamphetamine. There is no evidence that he ever used cocaine. And the Court granted my motion … with the specific order that it not be mentioned until Mr. Harrell made an offer of proof, and a further order of the Court was entered either specifically allowing it or allowing it with some limitation with respect to this case. And my argument … was to prevent exactly--or my motion was to prevent exactly what has happened here now. The jury is now hearing evidence about the use of cocaine or methamphetamine that has no basis in this case. There was no methamphetamine in his system at the time, as shown by two different laboratory results that will be entered into evidence. It was not a component of what occurred out at the scene on that particular evening. It was not … one of the propensities that we're trying here today. The use of methamphetamine or cocaine at a time distance from this incident had no interplay whatsoever with this particular case, and it certainly … it doesn't apply in any fashion to this case, at least at this point, and there is no order allowing it. And I feel that my client has been so prejudiced by the introduction of this evidence, that he cannot receive a fair trial on these particular charges.

"Now, this is a life plus 20 as the Court has previously stated … on occasion in this case, and I think that my client deserves every protection of the orders that this Court has previously issued. I don't think that once the bell has been rung in this case, that we can ever go back and cleanse this jury or eradicate that kind of a statement … from their minds, particularly in the way that it was stated. It wasn't a question, 'Well, are you' -- 'do you have any knowledge about anything else?' It was, 'Are you aware.' It was a direct accusation of the use of methamphetamine and cocaine, and we talked about this during the motion in limine, and we also spoke that I would be bringing in character witnesses, just as I brought in … Mr. Hedrick. And this was not a surprise that I would bring in a character witness, or that the Court's order had been made. And I just don't know how we can have a fair trial from this point forward with the state of the record at

this time.

"THE COURT: Mr. Harrell?

"MR. HARRELL: First off, Your Honor, I apologize to the Court, to Mr. Harralson, and most importantly to Mr. Jacome. I was aware of the Court's order, and my recollection of the Court's order is that those issues were not to be raised until there was further order of the Court. However … not by way of excuse, but by way of explanation, in the heat of trials, sometimes things are said, and, and, again, I apologize for doing that. I do not believe that … asking the question of 'would it change your opinion, if you learned that,' and I believe that's the way the question was phrased in this case, I don't believe that … is enough to prevent the Defendant from having a fair trial.

"I particularly note that in the CALJIC instruction which deals with the cross-examination of character witnesses, it allows for someone to ask a question of whether they've heard of reports of such conduct, and it makes real clear the questions and answers to them may be considered only for the purpose of determining their weight, not evidence that the reports are true, and they must not assume from them that they are true, and that the Defendant, in fact, engaged in that type of contact. That's 2.42 of CALJIC.

" … In retrospect, if--I should have inferred that that's the bottom line, but I do not believe it's going to prejudice the Defendant at this juncture because I believe it can be cured by way of that instruction, if the Court were so inclined to give it. We have, what--this is the very first Defense witness. It's my understanding that the Defendant is going to testify in this case, and it's the People's position that we would be allowed to ask the Defendant about his statements made to various doctors, during the course of his examinations in this case, and that's pursuant to People versus Stanfield where the People cited on the first day of trial, I believe during the motions hearing, and that is a 5th DCA case, we can use that to impeach. [¶] So I suspect the same information would come up once the Defendant took the stand and testified about whatever he's going to testify about."

After hearing the arguments of counsel, the court ruled:

"… I'm not declaring a mistrial on these facts. I'm striking the question. The question was, 'Sir, you said that knowing Mr. Jacome owned a gun would not change your opinion of him.' Answer, 'no it would not.' 'What about knowing that he used cocaine and methamphetamine while in your employ?' The answer in the record is, 'Yes.' 'Would that change your opinion?' And that's where the objection is. You know, I, frankly, think this witness could have been and should have been asked those very questions, but the time to get permission of the Court to do that was after direct, and prior to cross-examination, and not standing in front of the jury.

31

But I don't see how a witness can come up here and opine … he knew this guy for years, and he's an honest person, and not be asked about his closet drug habit that is highly probative to--it's a lie he lived, and didn't tell him about it, his own employer. So is that shocking? No, most people don't go to their employer and say, 'Hey, by the way, I got an illegal drug habit,' but it's the kind of thing their employer would like to know in assessing their truthfulness, honesty, and voracity [sic].

"Here we got a change of course in opinion testimony from characters at issue in the case to character for honesty and voracity [sic]. It changes the complexion of the relevance of this evidence. Had I been asked about it, I probably would have allowed it. As it is, based on the side bar, and based on your objection to it and your request for a mistrial, I declined to allow Counsel to inquire about it. I'll strike that from the record, and I will give 2.42.

"… But you think in the overall context of things, a question asked by an attorney, which is not evidence, and which a juror is reminded of, in the face of an instruction that is the questions and answers are not evidence that the reports are true and you must not assume from them that the Defendant did, in fact, conduct himself inconsistently with those traits of character, maybe there's something more by way of curative action the court can take … but, I frankly think these questions are gonna be asked of other witnesses if they continue to opine about his honesty and voracity [sic]."

When the jury returned to the courtroom, the court stated:

"Sorry for keeping you waiting, folks. There were some issues that we were discussing, and, you know, I tell you I'm working on jury instructions up here, and I am. I've got several of them that I've been working on and one of them I wanted to read to you now, while we're in this setting of examination of character witnesses. You'll get this at the end of the trial along with other character witness instructions, and other instructions about the case, but I felt it was appropriate to give it to you at this point in the case.

"A witness has been asked on cross-examination if he has heard reports of certain conduct of a defendant inconsistent with the traits of good character to which the witness has testified. These questions and the witness' answers to them may be considered only for the purpose of determining the weight to be given to the opinion of the witness or to his testimony as to the good reputation or character of the defendant. These questions and answers are not evidence that the reports are true, and you must not assume from them that the Defendant did, in fact, conduct him inconsistently with those traits of character.

"Further, I'll remind you that the statements of the attorneys are not evidence in the case and that a question is not

evidence unless adopted by a witness, and that I have stricken from the examination of the last witness *questions that were asked before a side bar,* and they are not part of the record, and you're to treat it as though you never heard them." (Italics added.)

At the conclusion of all evidence, the court again gave the jury the corrective instruction.

Appellant specifically contends:

"The trial court erred in denying appellant's motion for a mistrial because the question to Hedrick, whether he would change his opinion of appellant's character if he knew appellant had been using drugs 'while in [his] employ', was not proper impeachment of character evidence; because the court's 'curative' instruction was inaccurate and ineffective to cure the error; and because the prosecutor's admitted misconduct substantially undermined appellant's credibility as a witness and appellant's testimony was essential to his defense. [P]…[P]

"The court must prevent the prosecution from using cross-examination to explore issues completely irrelevant to the proffered character testimony. Here, the problem is that Hedrick was not asked whether he had heard about appellant's drug use, as a means of testing the basis of Hedrick's opinion about appellant's character, but rather whether his opinion would be different if he knew damaging information about appellant. Furthermore, appellant's drug use - which clearly did not affect his job performance and may not have occurred even while he was working - was not the sort of conduct that was inconsistent with him being a truthful person. Finally, appellant's drug use, which may have occurred in the privacy of his home and not while he was working, was not even necessarily the sort of activity that a character witness would know about. [P]…[P]

"A defendant's drug use is not information that is relevant to his reputation for truthfulness, nor is it the sort of information that a character witness could reasonably be expected to know about the defendant. For both of these reasons, it was improper for the prosecutor to pose the question, a fact that the prosecutor essentially conceded below."

A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged. A reviewing court uses the deferential abuse of discretion standard to review a trial court ruling denying a mistrial. (<u>People v. Silva</u>, supra, 25 Cal.4th at p. 372.) Prosecutorial misconduct is one of several grounds that can justify a mistrial. (<u>People v. Rodrigues</u> (1994) 8 Cal.4th 1060, 1154.) The applicable federal and state standards regarding prosecutorial misconduct are well established. A prosecutor's intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a

criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion and on the same ground the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. (People v. Samayoa (1997) 15 Cal.4th 795, 841.)

In California, a claim of prosecutorial misconduct is generally reviewable on appeal only if the defense makes a timely objection at trial and asks the trial court to admonish the jury to disregard the prosecutor's question. (People v. Sapp (2003) 31 Cal.4th 240, 279.) However, a defendant's failure to object or request an admonition is excused if either would be futile or an admonition would not have cured the harm caused by the misconduct. (People v. Hill (1998) 17 Cal.4th 800, 820; People v. Earp (1999) 20 Cal.4th 826, 858-859.)

In the instant case, appellant did not object to the initial question regarding Hedrick's knowledge of cocaine and methamphetamine usage while appellant was in his employ. Hedrick responded to that question by simply saying, "Yes." The prosecutor then asked "Would that change your opinion?" Defense counsel immediately interposed an objection to that question and the court and counsel went into a sidebar conference. However, defense counsel did not ask that the prosecutor be admonished before the jury. At the conclusion of the sidebar conference, the prosecutor asked, "So you said knowing what you know about the case wouldn't change your opinion [about Mr. Jacome?]" Hedrick replied by saying "it was out of character for him."

Generally speaking, a claim of prosecutorial misconduct is not preserved for appeal where, as here, there is no timely objection and a request for a curative admonition. An exception to this rule exists if the admonition would not have otherwise cured the harm caused by the misconduct. (People v. Earp, supra, 20 Cal.4th at p. 858.) Thus, appellant has waived any claim of prosecutorial misconduct unless we can say an admonition would not have otherwise cured the harm caused by the prosecutor's questions. Here, the prosecutor's questions were brief and isolated, the prosecutor apologized for his error, and then went on to offer legal analysis to support his line of inquiry on cross-examination. The court followed by instructing the jury on the use of character evidence and the rule that statements of counsel are not evidence. Moreover, the court informed the jurors it had "stricken from the examination of the last witness [Hedrick] questions that were asked before a side bar, and they are not part of the record, and you're to treat it as though you never heard them." Under these extenuating circumstances, the prosecutor's misconduct was harmless by any standard. (People v. Keenan (1988) 46 Cal.3d 478, 508, 250 Cal. Rptr. 550.) Similarly, the brief instance of arguably improper impeachment did not constitute a miscarriage of justice within the meaning of article VI, section 13 of the California Constitution. (People v. Newson (1951) 37 Cal.2d 34, 46.)

People v. Jacome, 2005 Cal. App. Unpub. LEXIS 4472, 38-53 (May 20, 2005).

1          2.      Applicable Legal Principles

2          A criminal defendant's due process rights are violated when a prosecutor's

3   misconduct renders a trial fundamentally unfair. Parker v. Matthews,    U.S.   , 132 S.Ct.

4   2148, 2153, 183 L. Ed. 2d 32 (2012) (per curiam); Darden v. Wainwright, 477 U.S. 168,

5   181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986). Claims of prosecutorial misconduct are

6   reviewed "'on the merits, examining the entire proceedings to determine whether the

7   prosecutor's [actions] so infected the trial with unfairness as to make the resulting

8   conviction a denial of due process.'" Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995)

9   (citation omitted); see also Greer v. Miller, 483 U.S. 756, 765, 107 S. Ct. 3102, 97 L. Ed.

10  2d 618 (1987); Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed.

11  2d 431 (1974); Towery v. Schriro, 641 F.3d 300, 306 (9th Cir. 2010). Relief on such

12  claims is limited to cases in which the petitioner can establish that prosecutorial

13  misconduct resulted in actual prejudice. Darden, 477 U.S. at 181-83. See also Towery,

14  641 F.3d at 307 ("When a state court has found a constitutional error to be harmless

15  beyond a reasonable doubt, a federal court may not grant habeas relief unless the state

16  court's determination is objectively unreasonable"). Prosecutorial misconduct violates

17  due process when it has a substantial and injurious effect or influence in determining the

18  jury's verdict. See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

19         3.      Analysis

20         Here, Petitioner objects to the prosecutor's asking Petitioner's employer if

21  Petitioner's drug use would negatively impact the employer's favorable opinion of

22  Petitioner. Specifically, Petitioner asserts that the question was improper and prejudicial

23  in light of the in limine ruling of the court to prohibit such questioning without prior

24  consent. (Traverse at 17.) As described, the conduct of the prosecutor involved one

25  inappropriate question. (Answer at 29.) Further, the trial court noted that the question

26  was inappropriate based on the failure to ask the court's permission as discussed in

27  deciding the in limine ruling, but that had permission been sought, the question likely

28  would have been allowed.

1          The California Court of Appeal examined Petitioner's prosecutorial misconduct

2     claims and determined that there was no prejudicial misconduct. The state court's

3     determination was not objectively unreasonable. See 28 U.S.C. § 2254(d). While the

4     prosecutor asked a question without authorization, he apologized for the conduct and

5     readily offered a curative instruction be provided to the jury. This does not suggest

6     misconduct. In general, questioning does not amount to a due process violation if the

7     court instructs the jury not to consider the prosecutor's questions. See Greer v. Miller,

8     483 U.S. 756, 766 n.8, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987) (if curative instruction is

9     given, reviewing court presumes that jury disregarded inadmissible evidence and that no

10    due process violation occurred); Trillo v. Biter, 754 F.3d 1085, 1089 (9th Cir. 2014) ("We

11    presume that juries listen to and follow curative instructions from judges."). The instance

12    of misconduct about which Petitioner complains was not so unfair as to constitute a due

13    process violation. Towery v. Schriro, 641 F.3d 300, 306 (9th Cir. 2010). Regardless, the

14    decision of the state appellate court rejecting these claims of prosecutorial misconduct is

15    not "so lacking in justification that there was an error well understood and comprehended

16    in existing law beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at

17    786-87. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

18          **D.      Claim Four: Sentencing Error under Apprendi and Blakely**

19          In his fourth claim, Petitioner asserts that he was incorrectly sentenced under

20    California's sentencing laws that were found unconstitutional by the United States

21    Supreme Court in that they infringed on a criminal defendant's right to trial. See United

22    States v. Booker, 543 U.S. 220, 230 (2005); Blakely v. Washington, 542 U.S. 296, 301

23    (2004); Apprendi v. New Jersey, 530 U.S. 466, 476-477 (2000).) As explained below,

24    after vacating Petitioner's sentence on other grounds, the court denied Petitioner's claim

25    of sentencing error.

26          1.      Procedural History and State Court Decision

27          After being found guilty, Petitioner was sentenced as follows:

28                 The court then denied appellant probation and sentenced him on

count I to the term of life in state prison with the possibility of parole. As to that count, the court additionally imposed a term of 20 years for the firearm discharge enhancement ( § 12022.53, subd. (cc)) and stayed under section 654 the sentences imposed on the remaining enhancements. The court imposed the upper term of 12 years on count II but stayed that term and terms applicable to the related personal firearm use enhancements under section 654. The court imposed a concurrent term of two years on count III.

Jacome, 2005 Cal. App. Unpub. LEXIS 4472, at 3-4. Petitioner appealed the sentence in light of Blakely and Apprendi. Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Answer, Ex. A., Lodged Doc. 24.) Accordingly, using the look-through doctrine, the Court shall review the California Court of Appeal decision, the last reasoned state court decision. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991) The California Court of Appeal denied Petitioner's claim, however, it vacated the sentence on other grounds, specifically that the court denied Petitioner's request to obtain new counsel before sentencing. The court explained:

**RETAINED COUNSEL**

Appellant contends the trial court erred by refusing to allow him to discharge his retained counsel prior to sentencing.

…

Appellant's exchange with the court strongly suggests that he was trying to discharge his retained counsel. The court properly acknowledged that it was not required to conduct a Marsden hearing, and that appellant was entitled to fire his retained counsel without satisfying Marsden. The court's mistake occurred, however, when it asked appellant whether he wanted a continuance so he could hire another attorney. Appellant replied that he lacked the means to hire another attorney, and asked if the court could "assign" an attorney to represent him. The court mistakenly interpreted appellant's comments as a request for advisory counsel to prepare a motion for new trial. Instead, appellant was clearly trying to find out if the court could appoint counsel to represent him if he fired his retained counsel. While Mr. Harralson was technically retained, he clarified that he was representing appellant in a pro bono capacity from which indigency can be implied. Moreover, appellant clearly stated that he lacked the financial means to hire another attorney. Thus, the court should have advised appellant that if he fired his retained counsel, the court could appoint an attorney to represent him if he was indigent. This is the answer to the inquiry which appellant was attempting to make. It was in our view this failure to advise of the right to appointed counsel under such circumstances which may well have led appellant to continue Mr.

Harralson's representation, i.e., he was lead to believe that it was Mr. Harralson or no attorney at all. (People v. Ortiz, supra, 51 Cal.3d at pp. 984-985.) The error is not harmless. (Id. at pp. 987-988.)

In reaching this conclusion we first point out without the need for extended discussion that neither exception to the absolute right to discharge retained counsel is raised here. (People v. Lara, supra, 86 Cal.App.4th at p. 153.)

We next note that appellant's statements at the sentencing hearing represented his first request to discharge his retained counsel. During the trial, appellant did not previously express any dissatisfaction with his attorney, or make any comments which could be interpreted as an attempt to discharge his attorney. Thus, the court's error has no effect upon appellant's trial on the substantive offenses and special allegations, and the jury's findings on those issues will not be disturbed. Instead, the court's failure to properly respond to appellant's request to discharge his attorney will only result in the vacation of the sentence imposed herein.

We will thus vacate the sentence imposed and remand the matter to the trial court for further proceedings consistent with the views expressed in this opinion.

**V.**

**SENTENCE ISSUES**

Notwithstanding our vacating the sentence imposed, for the benefit of the trial court on remand, we discuss two sentencing issues raised by appellant.

A. Sections 12022.5 and 12022.53 Enhancements

Appellant contends and the People concede the trial court erroneously imposed sentence enhancements under both sections 12022.5 and 12022.53 for counts I and II.

The People accurately summarize the error:

"The firearms enhancements appurtenant imposed and then stayed by the trial court under Penal Code section 12022.5 for counts one and two cannot stand in light of the fact that enhancements were imposed for the same counts pursuant to Penal Code section 12022.53. Penal Code section 12022.53(f) states, in pertinent part: 'An enhancement involving a firearm specified in Section 12021.5, 12022, 12022.3, 12022.4, 12022.5, or 12022.55 shall not be imposed on a person in addition to an enhancement imposed pursuant to this section.' (See also People v. Bracamonte (2003) 106 Cal.App.4th 704, 712-713 & fn. 5.)…"

Accordingly the trial court must strike the two enhancements under section 12022.5, subdivision (a)(1).

1

### B. Aggravated Sentence

2

3

4

In supplemental letter briefs filed September 13, 2004, December 23, 2004, and January 31, 2005, appellant contends his sentencing violated the principles of <u>Blakely v. Washington</u> (2004) 542 U.S. _____ [124 S. Ct. 2531] (<u>Blakely</u>), and <u>Apprendi v. New Jersey</u> (2000) 530 U.S. 466, 147 L. Ed. 2d 435 (<u>Apprendi</u>).

5

6

7

On the afternoon of October 7, 2003, the court received corrections to the report of the probation officer, offered its tentative ruling as to sentencing, heard the arguments of counsel, and then sentenced pursuant to its tentative ruling. In making the tentative ruling the court stated in relevant part:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

"… I would find that the Defendant is not eligible for probation pursuant to 12022.53G. Even if he were eligible for probation, in light of the nature of the crime, he would not be a good candidate for probation. I do find that the crime involved great violence, and threat of great bodily harm, and disclosed a high degree of at least callousness and recklessness, but by the jury's verdict, specific intent to kill a police officer, I don't find fault in that verdict, nor do I find fault in their conclusion that he had an opportunity to and did premeditate the conduct before committing it. That conduct is dangerous to society. And the other factors in aggravation are minimal, but I find they apply as set out at page 6. I don't find a recognized factor in mitigation except to the extent that one might find that the Defendant was suffering from a mental or physical condition that significantly reduced culpability for the crime…. I think that's not applicable, but that would be the only factor in mitigation that I could find based on his intoxication. I do find that the offenses in Counts 1 and 3 occurred so close in time that they should run concurrent and that the acts which underlie the charge in Count 1 and the charge in Count 2 are the same acts, and, therefore, any term on Count 2 should be stayed pursuant to 654 of the Penal Code. The appropriate sentence then would be--oh, and, again, we have the other gun enhancement 12022.5(a) (1) enhancement, we also have the 12022.53(b) enhancement, those, again, involve the same acts as the enhancement which the jury found true and which carries the greater penalty, that being 12022.53(c). So that will be the term that would be imposed. The other terms for the other enhancements also found true by the jury will be stayed pursuant to 654. I find an aggravated term of ten years on the 12022.5(a) (1) enhancement would be appropriate. The 10-year-term for the 12022.53(b) enhancement will be stayed, and the appropriate term then for the enhancement 12022.53(c) is 20 years, either by the jury's finding that the Defendant knew that the officer was a police officer acting in the performance of his duties, or based on the jury's finding that the Defendant premeditated ... the attempted murder, either of those makes the appropriate term for the crime life in prison with the possibility of parole for 664/187(a). As far as the

245(d) (3), I would find the aggravated term is appropriate, and I'll stay the 12-year term there along with the gun enhancements of 10 years, and 10 years. Count 3, I find that on its facts it's more or less a normal flight, notwithstanding what it culminated in, but the acts of flight were not unusual, and on balance that would be an appropriate two-year middle term which would run concurrent with the term in Count 1.

"Defendant, then, would receive a term of 20 years plus life in prison with the possibility of parole, credit for 563 actual days and 84 days good time-work time, pursuant to 2933.1…."

Defendant specifically argues on appeal:

"Mr. Jacome, then, was subjected to three separate aggravated sentences based on facts found by the trial judge but not found by the jury. As a consequence, Mr. Jacome was denied his Sixth Amendment right to a jury trial and proof beyond a reasonable doubt of the aggravating factors used to impose a sentence greater than the statutory maximum of four years, the middle term under [*69] Penal Code section 12022.5, subdivision (a), and the statutory maximum of nine years, the middle term under Penal Code section 245, subdivision (d)(3). (U.S. Const., amends. VI and XIV; Blakely v. Washington (2004) [542] U.S. _____, 124 S. Ct. 2531; Apprendi v. New Jersey (2000) 530 U.S. 466, 147 L. Ed. 2d 435."

This contention is based on the recent United States Supreme Court cases of Blakely, supra, 542 U.S. ___ [124 S. Ct. 2531] and Apprendi, supra, 530 U.S. 466. In our view, the holdings in Blakely and Apprendi do not apply when the exercise of judicial discretion is kept within a sentencing range authorized by statute for the specific crime of which the defendant is convicted by jury.

In Apprendi, supra, 530 U.S. 466, the court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (Id. at p. 490.) In Blakely, the court explained that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (Blakely, supra, 542 U.S. at p. ___ [124 S. Ct. at p. 2537].) In each case, state law established an ordinary sentencing range for the crime the defendant was convicted of committing, but allowed the court to impose a sentence in excess of that range if it determined the existence of specified facts not intrinsic to the crime. In each case, the United States Supreme Court held that a sentence in excess of the ordinary range was unconstitutional because it was based on facts that were not admitted by the defendant or found true by the jury beyond a reasonable doubt.

Given this backdrop, we find California's determinate sentencing law constitutional and appellant's present sentence constitutionally permitted. Under this state's determinate sentencing law, each applicable

specific offense is given a sentencing range that includes lower, middle and upper terms. A defendant's right to a jury trial for that offense is with the understanding that the upper term is the maximum incarceration he may be required to serve if convicted of the specific offense for which he faces trial. Should the People allege enhancement charges, those are separately charged and the defendant is entitled to a jury's determination of the truth of such charges.

The language of the various rules and code sections applicable to selection of the base term work together to provide a system where after considering the entire record, the sentencing court may select any of three possible sentencing choices. (§ 1170, subd. (a).) This choice is discretionary and designed to tailor the sentence to the particular case. (People v. Scott (1994) 9 Cal.4th 331, 349.) The determination of the court's choice of term within the particular range allowed for a specific offense is determined after an evaluation of factors in mitigation and aggravation. These sentencing factors, consistent with the definition found in Apprendi, are weighed by the sentencing judge in determining the term of punishment within the specific offense's sentencing range. If there are no such factors or neither the aggravating nor mitigating factors preponderate, the court shall choose the middle term; additionally, the court retains the discretion to impose either the upper or middle term where it finds the upper term is justifiable. (People v. Thornton (1985) 167 Cal. App. 3d 72, 76-77, 212 Cal. Rptr. 916.) A trial court has wide discretion in considering aggravating and mitigating factors. (People v. Evans (1983) 141 Cal. App. 3d 1019, 1022, 190 Cal. Rptr. 633.) Such an exercise of discretion does not violate the constitutional principles set forth in Apprendi and followed in Blakely because the court's discretion is exercised within the specific statutory range of sentence.

Our conclusion finds support in the recent amplification of Apprendi and Blakely in United States v. Booker (2005) 160 L. Ed. 2d 621, 543 U.S. ___ [125 S. Ct. 738] (Booker). In Booker, the United States Supreme Court reversed the defendant's sentence under the federal sentencing guidelines and concluded that the guidelines were unconstitutional under Apprendi and Blakely if they were given mandatory effect. Booker reaffirmed the constitutional principle articulated in Apprendi and reaffirmed in Blakely: "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." (Booker, supra, 543 U.S. at p. ___ [125 S. Ct. at p. 756] (maj. opn. of Stevens , J.).) The court held this principal applies to "sentencing factors" that serve to increase the applicable sentencing range prescribed by the federal sentencing guidelines because the guidelines "are mandatory and binding on all judges" and "have the force and effect of laws." (Booker, supra, 543 U.S. at p. ___ [125 S. Ct. at p. 750] (maj. opn. of Stevens , J.).) But the court reaffirmed the constitutionality of a discretionary sentencing scheme in which the sentencing court makes factual determinations in order to select a term from within a range of sentences:

"If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a

judge to exercise broad discretion in imposing a sentence within a statutory range. [Citations.]… For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." (Booker, supra, 543 U.S. at p. ___ [125 S. Ct. at p. 750] (maj. opn. of Stevens , J.).)

California's determinate sentencing law requires the trial court to exercise its discretion to select from a range of three possible sentences. The California Rules of Court provide guidance by enumerating facts relevant to the sentencing decision, but they do not make any particular sentence mandatory assuming such facts are found. Section 1170, subdivision (b) simply precludes the imposition of an upper term sentence where there are no factors in aggravation, a provision which operates in the defendant's favor and does not increase the statutory maximum for a particular crime.

As set forth ante, the trial court herein selected the upper term based upon its analysis of sentencing factors. Under California law, a single factor in aggravation is sufficient to support the upper term. (People v. Osband (1996) 13 Cal.4th 622, 730.)

The court's choice of term was within the statutory range allowed for the specific offense of commission of an assault with an assault weapon upon a peace officer under section 245, subdivision (d)(3). No constitutional violation occurred.

**DISPOSITION**

With the sole exception of the two Penal Code section 12022.5, subdivision (a)(1) enhancements, the convictions of the substantive crimes in counts I, II and III and each of the attendant findings and enhancements are affirmed. The sentence imposed is vacated and the matter is remanded to the trial court for consideration of any request of appellant pertaining to representation of counsel, any appropriate posttrial motions and resentencing as may be applicable, and all in accord with the views expressed in this opinion.

Jacome, 2005 Cal. App. Unpub. LEXIS 4472, 53-76.

After the decision of the court of appeal, the matter was twice remanded to the superior court. Petitioner was finally re-sentenced by the court on December 7, 2007. (See Lodged Doc. 333-337.)

    2.    Analysis

Petitioner contends that he was sentenced in violation of Apprendi and its progeny. Respondent asserts that Petitioner failed to exhaust his state court remedies on this claim because while he appealed his original sentence, he did not appeal his

1    December 7, 2007 sentencing in state court. Further, Respondent contends that at the
2    time of the final sentencing, California sentencing law had changed, and no longer
3    required a jury finding of aggravating circumstances to qualify for the upper term
4    sentence. To promote judicial efficiency, the Court shall address the merits of the claim,
5    regardless of whether Petitioner properly exhausted the claim in state court. See 28
6    U.S.C. § 2254(b)(2).

7         As discussed, Petitioner claims that the trial court violated Apprendi, 530 U.S.
8    466, Blakely, 542 U.S. 296, and Cunningham, 549 U.S. 270, by sentencing him to the
9    upper term without having found valid categories of aggravating circumstances to justify
10   such imposition. The California Court of Appeal rejected Petitioner's claim, concluding
11   that the trial court, in its discretion, could impose the upper term. Jacome, 2005 Cal.
12   App. Unpub. LEXIS 4472, 53-76.

13        The Sixth Amendment to the United States Constitution guarantees a criminal
14   defendant the right to a trial by jury. U.S. Const. amend. VI. Apprendi, 530 U.S. at 477,
15   and its progeny extended a defendant's right to trial by jury to the fact finding used to
16   make enhanced sentencing determinations as well as the actual elements of the crime.
17   "Other than the fact of a prior conviction, any fact that increases the penalty for a crime
18   beyond the prescribed statutory maximum must be submitted to a jury, and proved
19   beyond a reasonable doubt." Id. at 488-90. The "statutory maximum" for Apprendi
20   purposes is the maximum sentence a judge could impose based solely on the facts
21   reflected in the jury verdict or admitted by the defendant; that is, the relevant "statutory
22   maximum" is not the sentence the judge could impose after finding additional facts, but
23   rather is the maximum he or she could impose without any additional findings. Blakely,
24   542 U.S. at 303-04.

25        In Cunningham, 549 U.S. at 288-89, the Court held that California's determinate
26   sentencing law ("DSL") - which used a sentencing triad of lower/middle/upper terms -
27   violated the Sixth Amendment because it allowed the sentencing court to impose an
28   upper term sentence based on aggravating facts that it found to exist by a

1    preponderance of the evidence. On March 30, 2007, in response to the Supreme Court's

2    suggestion in <u>Cunningham</u> that California could cure any constitutional defect in section

3    1170(b) by leaving the selection of an appropriate sentence to the judge's discretion,

4    <u>Cunningham</u>, 549 U.S. at 293-94, the California Legislature enacted Senate Bill 40,

5    which amended section 1170(b). <u>See</u> Cal. Stats. 2007, ch. 3 (S.B.40), § 3, eff. Mar. 30,

6    2007; <u>Butler v. Curry</u>, 528 F.3d 624, 630 n.5 (9th Cir. 2008) (acknowledging section

7    1170(b)'s amendment). Under amended section 1170(b), a trial court still exercises its

8    discretion in selecting among the upper, middle or lower terms, but no additional fact

9    finding is required to impose an upper or lower term. <u>See</u> <u>Butler</u>, 528 F.3d at 652 n.20

10   ("imposition of the lower, middle, or upper term is now discretionary and does not

11   depend on the finding of any aggravating factors"); accord <u>People v. Sandoval</u>, 41 Cal.

12   4th 825, 843-45, 62 Cal. Rptr. 3d 588, 161 P.3d 1146 (2007).

13        Here, the trial court sentenced Petitioner in December, 2007 — after the effective

14   date of the amendment to section 1170(b). The applicable law at sentencing therefore

15   was California's amended sentencing scheme, which the Court finds complies with

16   <u>Cunningham</u> as applied to petitioner. Specifically, under amended section 1170(b), the

17   trial court was not required to find an additional fact in order to impose the upper term

18   sentence; rather, the decision to impose a lower, middle, or upper term was deemed

19   discretionary. <u>See</u> <u>Butler</u>, 528 F.3d at 652 n.20. Petitioner, in his traverse, presents no

20   argument as to why the amended sentence scheme should not be applied to his

21   sentencing, which ultimately occurred after amendment of California's sentencing laws.

22        In view of California's decision to follow <u>Cunningham</u>'s suggested sentencing

23   scheme in order to avoid a Sixth Amendment violation, the state court's rejection of

24   petitioner's Sixth Amendment claim under such sentencing scheme cannot be said to be

25   contrary to, or an unreasonable application of, clearly established Supreme Court

26   precedent. <u>See</u> 28 U.S.C. § 2254(d); accord <u>Neri v. Allison</u>, No. 10-2867 RMW, 2012

27   U.S. Dist. LEXIS 43157, 2012 WL 1067569, *12 (N.D. Cal. March 28, 2012); <u>McCowan</u>

28   <u>v. Marshall</u>, No. 10-0473 CRB, 2011 U.S. Dist. LEXIS 47083, 2011 WL 1544490, *3

1    (N.D. Cal. April 25, 2011); Mohammed v. Brazelton, 2014 U.S. Dist. LEXIS 123577, *9-

2    12 (N.D. Cal. Sept. 2, 2014).

3           **E.    Claims Five and Six: Ineffective Assistance of Counsel**

4           In his fifth and sixth claims, Petitioner asserts that both his trial counsel and

5    appellate counsel were ineffective. (Pet. at 33-47.) Petitioner asserts that counsel was

6    ineffective for failure to perform a proper investigation and failure to obtain a ballistics

7    expert to rebut the prosecution's experts.

8                  1.    State Decision

9           Petitioner presented his ineffective assistance of counsel claim by way of a

10   petition for writ of habeas corpus to the California Supreme Court. (Lodged Doc. 39.)

11   The court summarily denied the petition. (Id.) In such cases, the Supreme Court has

12   instructed that the court must determine what "arguments or theories… could have

13   supported[] the state court's decision; then it must ask whether it is possible fairminded

14   jurists could disagree that those arguments or theories are inconsistent with the holding

15   in a prior decision of this Court." Richter, 131 S. Ct. at 786.

16                 2.    Law Applicable to Ineffective Assistance of Counsel Claims

17          The law governing ineffective assistance of counsel claims is clearly established

18   for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).

19   Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998). In a petition for writ of habeas

20   corpus alleging ineffective assistance of counsel, the Court must consider two factors.

21   Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Lowry

22   v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's

23   performance was deficient, requiring a showing that counsel made errors so serious that

24   he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.

25   Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell

26   below an objective standard of reasonableness, and must identify counsel's alleged acts

27   or omissions that were not the result of reasonable professional judgment considering

28   the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

1    (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court

2    indulges a strong presumption that counsel's conduct falls within the wide range of

3    reasonable professional assistance. <u>Strickland</u>, 466 U.S. at 687; <u>see also</u>, <u>Harrington v.</u>

4    <u>Richter</u>, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

5        Second, the petitioner must demonstrate that "there is a reasonable probability

6    that, but for counsel's unprofessional errors, the result ... would have been different,"

7    <u>Strickland</u>, 466 U.S. at 694. Petitioner must show that counsel's errors were so

8    egregious as to deprive defendant of a fair trial, one whose result is reliable. <u>Id.</u> at 687.

9    The Court must evaluate whether the entire trial was fundamentally unfair or unreliable

10   because of counsel's ineffectiveness. <u>Id.</u>; <u>Quintero-Barraza</u>, 78 F.3d at 1348; <u>United</u>

11   <u>States v. Palomba</u>, 31 F.3d 1456, 1461 (9th Cir. 1994).

12       A court need not determine whether counsel's performance was deficient before

13   examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

14   <u>Strickland</u>, 466 U.S. at 697. Since the defendant must affirmatively prove prejudice, any

15   deficiency that does not result in prejudice must necessarily fail. However, there are

16   certain instances which are legally presumed to result in prejudice, e.g., where there has

17   been an actual or constructive denial of the assistance of counsel or where the State has

18   interfered with counsel's assistance. <u>Id.</u> at 692; <u>United States v. Cronic</u>, 466 U.S., at 659,

19   and n.25 (1984).

20       As the Supreme Court reaffirmed recently in <u>Harrington v. Richter</u>, meeting the

21   standard for ineffective assistance of counsel in federal habeas is extremely difficult:

22           The pivotal question is whether the state court's application of the
     <u>Strickland</u> standard was unreasonable. This is different from asking
23   whether defense counsel's performance fell below <u>Strickland</u>'s standard.
     Were that the inquiry, the analysis would be no different than if, for
24   example, this Court were adjudicating a <u>Strickland</u> claim on direct review
     of a criminal conviction in a United States district court. Under AEDPA,
25   though, it is a necessary premise that the two questions are different. For
     purposes of § 2254(d)(1), "an unreasonable application of federal law is
26   different from an incorrect application of federal law." <u>Williams</u>, supra, at
     410, 120 S. Ct. 1495, 146 L. Ed. 2d 389. A state court must be granted a
27   deference and latitude that are not in operation when the case involves
     review under the <u>Strickland</u> standard itself.
28

                                    46

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Ibid.</u> "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 129 S. Ct. 1411, 1419, 173 L. Ed. 2d 251, 261 (2009) (internal quotation marks omitted).

<u>Harrington v. Richter</u>, 131 S. Ct. at 785-86.

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id.</u> at 786. "As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." <u>Id.</u> "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Id.</u> at 786-87.

Accordingly, even if Petitioner presents a strong case of ineffective assistance of counsel, this Court may only grant relief if no fairminded jurist could agree on the correctness of the state court decision.

               3.     Analysis

Providing the state court decision with appropriate deference, fair-minded jurists could disagree whether counsel fell below an objective standard of reasonableness, or, alternatively, that Petitioner was prejudiced by counsel's conduct.

Petitioner asserts that counsel failed to properly investigate the circumstances of the crime, and that any reasonable attorney would have at least consulted with a ballistics expert to determine if the shooting occurred in the manner described by the police. (Traverse at 35.) Petitioner claims that since he was not able to remember the incident in question, that a ballistics expert could determine if the testimony of the police and the prosecution's experts was inaccurate.

1    Respondent contends that Petitioner has not shown that he was prejudiced by

2    counsel's conduct as "there was conceivable basis to dispute that Petitioner fired shots

3    at the officers." (Answer at 37.) The Court agrees that regardless of whether counsel's

4    investigation was inadequate, Petitioner cannot show that he was prejudiced by the

5    conduct.

6    The facts of the confrontation between Petitioner and the officers was not in

7    material dispute. At 12:30 a.m., following at tip from another motorist, officer Johnson

8    pursued Petitioner in his truck for suspicion of drunk driving. Johnson engaged in a

9    chase of Petitioner, during which Petitioner was driving dangerously and erratically.

10   Seargeant Sanders and officer Theile joined the pursuit. Petitioner stopped his truck in a

11   rural area. Officer Johnson began to step out of his vehicle, but saw Petitioner was

12   pointing a gun at him. The other two officers saw Petitioner fire shots towards Johnson

13   and returned fire.  See People v. Jacome, 2008 Cal. App. Unpub. LEXIS 10542 (Dec.

14   30, 2008).

15   Petitioner was wounded, and upon approaching his vehicle the officers found a

16   gun and casings in and around the vehicle. Officer Johnson also noted three holes in the

17   driver's side door of his police car and saw that another round had shattered the

18   passenger side window of that car. Jacome, 2008 Cal. App. Unpub. LEXIS 10542.

19   During the investigation, Jose Guerrero, an identification technician with the

20   Fresno County Sheriff's Department, said he examined Johnson's police car and found

21   three bullet holes in the driver's side door and recovered three spent bullets inside the

22   vehicle. He determined the bullet holes were made by shots fired from outside the

23   vehicle. Nine expended casings were found at the scene. The casings and the spent

24   projectiles were of nine-millimeter caliber. Michael Giborson, a criminalist with the

25   Fresno County Sheriff's Department Forensics Laboratory, examined the expended

26   projectiles found in Johnson's vehicle and said they had been fired from appellant's

27   assault weapon. Jose Guerrero further testified the trajectory of the bullets was

28   consistent with having come from appellant's position in the pickup truck. Jacome, 2008

1   Cal. App. Unpub. LEXIS 10542.

2        Accordingly, there was extremely probative physical and eyewitness evidence

3   that Petitioner shot at officer Johnson from his truck. There is no reason to believe that a

4   ballistics expert hired by Petitioner would have come to a different conclusion regarding

5   whether Petitioner shot at the officer. Petitioner has not provided a plausible alternative

6   explanation as to what could have occurred during the incident that would show that

7   Petitioner was not guilty of the offense. The incident occurred late at night in a rural area.

8   No evidence was provided that any other people were in the vicinity. If anything, a

9   ballistics expert would likely have corroborated the testimony of the prosecution experts

10  in showing that the shots were likely fired by Petitioner.

11       Accordingly, it would have been a reasonable tactical decision of trial counsel to

12  not investigate further or hire a ballistics expert in light small likelihood of success of

13  providing a viable defense to the shooting. Further, Petitioner has not shown that he was

14  prejudiced by counsel's conduct as there is no reasonable probably that a ballistics

15  expert would have provided beneficial testimony to Petitioner.

16       In sum, the Court cannot find that trial counsel fell below an objective level of

17  performance, or that Petitioner was prejudiced by counsel's conduct. Nor can the Court

18  find that appellate counsel was ineffective for raising the issues on direct appeal.  The

19  state court decision was not an unreasonable determination of federal law. Petitioner is

20  not entitled to habeas corpus relief.

21  **IV.    RECOMMENDATION**

22       Accordingly, it is hereby recommended that the petition for a writ of habeas

23  corpus be DENIED with prejudice.

24       This Findings and Recommendation is submitted to the assigned District Judge,

25  pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after

26  being served with the Findings and Recommendation, any party may file written

27  objections with the Court and serve a copy on all parties. Such a document should be

28  captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply

to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   October 30, 2014                      /s/ *Michael J. Seng*

UNITED STATES MAGISTRATE JUDGE